## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LLOYD, *et al.*, | : | Hon. Joseph H. Rodriguez |
| | : | |
| *Plaintiffs*, | : | |
| | : | Civil No. 21-17057 |
| v. | : | |
| | : | |
| THE RETAIL EQUATION, INC., *et al.*, | : | **OPINION** |
| | : | |
| *Defendants.* | : | |
| | : | |
| | : | |

Presently before the Court is the motion by defendant TJX Companies, Inc. seeking an order (i) compelling arbitration of all claims asserted by plaintiff Carol Lloyd, individually and on behalf of a putative class, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., and (ii) dismissing without prejudice Counts One, Three and Five in the Complaint asserted by plaintiff Carol Lloyd or, in the alternative, staying these causes of action and claims [Dkt. 15]. The Court is in receipt of the opposition filed by plaintiff Carol Lloyd [Dkt. 22] as well as the reply of TJX Companies, Inc. [Dkt. 27]. For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.      Background

This matter is a putative class action concerning the alleged unlawful collection of consumer data and its use in approving or denying consumers returns or exchanges at certain retail stores. Plaintiff Carol Lloyd ("Lloyd"), on behalf of herself and the putative class(es) she seeks to represent, initiated this suit on September 16, 2021 against defendants The Retail Equation, Inc. ("TRE") and The TJX Companies, Inc. ("TJX") (among other defendants).

Lloyd is a New Jersey resident who purchased merchandise from TJX through the TJ Maxx[1] website (the "Website") on April 6, 2019, May 21, 2019, July 31, 2020, November 11, 2020, May 20, 2021, and October 21, 2021. *Mot.* at \*5. On or about May 9, 2019, Lloyd attempted a return or exchange of certain of the previously purchased merchandise at a TJ Maxx retail store. *Compl.* ¶ 35, [Dkt. 1] ("Complaint"). At the time of the attempted return or exchange, the sales associate allegedly "communicated to [Lloyd] . . . that the return or exchange was flagged as potentially fraudulent and that future attempts by [Lloyd] . . . to return or exchange merchandise without a receipt would be declined based upon the recommendation of TRE . . ." *Id.* ¶¶ 43-44.

TRE is a corporate defendant named in this action but not a party to this instant motion whom TJX contracted with in an effort to combat retail fraud. TRE provides a "software-as-a-service" that uses statistical modeling and analytics to detect fraudulent behavior when returns are processed at a retailer's return counter. *Compl.* ¶¶ 15, 28. Using its patented software, TRE generates "risk scores" for individual customers attempting to return or exchange items and makes recommendations to the Retail Defendants about whether to approve or deny the processing of same. *Id.* ¶¶ 14, 28. These risk scores are calculated with a mix of data collected by retailers, both Consumer Commercial Activity Data and Consumer ID Data. *Id.* ¶ 2. Consumer Commercial Activity Data includes purchase and return history as well as the contents, method, and frequency of consumer purchases. *Id.* ¶ 18 Consumer ID Data contains information available on various forms of identification and includes "name, date of birth, race, sex, photograph, complete street address, and zip code." *Id.* ¶ 19.

---

[1] TJ Maxx and Marshalls together form the Marmaxx division of The TJX Companies, Inc.

Lloyd alleges she was harmed by: (a) the sharing of her Consumer Commercial Activity Data and Consumer ID Data by TJX; (b) the receipt of her Consumer Commercial Activity Data and Consumer ID by TRE; and (c) the use of her Consumer Commercial Activity and Consumer ID Data. *Id.* ¶ 19. Lloyd claims that as a result of these practices, she is prevented from making future returns or exchanges without a receipt. *Id.* ¶ 45. The Complaint pleads the following causes of action against TJX stemming from the alleged conduct: invasion of privacy (Count One); violation of the New Jersey Consumer Fraud Act N.J. Stat. Ann. § 56:8-1, et seq. ("NJCFA") (Count Three); and, unjust enrichment (Count Five). *See* Dkt. 1.

On January 28, 2022, TJX filed the instant motion to compel Lloyd's claims to arbitration on the asserted basis that "she agreed to arbitrate all disputes with TJX – including any dispute related to TJX's collection, use, or transmission of customer information." *Mot.* at *1. In support of the motion, TJX introduces a declaration made on the personal knowledge of Caitlin Kobelski, Vice President, Digital Experience and Site Operations ("Kobelski"), containing exhibits purporting to be screenshots showing the "checkout flow" process "as it would have appeared to Lloyd[.]" *Kobelski Decl.* ¶ 3, Exhibit B. TJX maintains that Lloyd agreed to arbitrate any dispute with TJX each time she made a purchase through TJX's TJ Maxx website by clicking an icon displaying the words "PLACE ORDER" appearing on the final page of the Website's "checkout flow" process. The screenshot shows the "PLACE ORDER" icon displayed directly below a notice appearing in black font against a white background and comparatively smaller in size. The notice provides that "By placing your order, you agree to the T.J. Maxx <u>terms of use</u>[.]" The underlined phrase "<u>terms of use</u>" was a hyperlink that, when selected, caused the Terms Of Use ("TOU") to appear in a new browser window.

TJX also introduces copies of the TOU as it would have appeared on various dates corresponding to Lloyd's purchases. *Kobelski Decl.* ¶¶ 4-7, Exhibits C, D, E, F. Since at least January 2019, the TOU have provided, in relevant part

> Arbitration Agreement & Waiver Of Certain Rights You and the TJX Businesses agree that we will resolve any disputes between us through binding and final arbitration instead of through court proceedings. You and the TJX Businesses hereby waive any right to a jury trial of any Claim. All controversies, claims, counterclaims, or other disputes arising between you and the TJX Businesses relating to these Terms or the Website (each a "Claim") shall be submitted for binding arbitration in accordance with the Rules of the American Arbitration Association ("AAA Rules"). The arbitration will be heard and determined by a single arbitrator. The arbitrator's decision in any such arbitration will be final and binding upon the parties and may be enforced in any court of competent jurisdiction

> * * *

> Neither you nor the TJX Businesses may act as a class representative or private attorney general, nor participate as a member of a class of claimants, with respect to any Claim. Claims may not be arbitrated on a class or representative basis. The arbitrator can decide only your and/or the TJX Businesses' individual Claims. The arbitrator may not consolidate or join the claims of other persons or parties who may be similarly situated.

> * * *

> THIS SECTION LIMITS CERTAIN RIGHTS, INCLUDING THE RIGHT TO MAINTAIN A COURT ACTION, THE RIGHT TO A JURY TRIAL, THE RIGHT TO PARTICIPATE IN ANY FORM OF CLASS OR REPRESENTATIVE CLAIM, THE RIGHT TO ENGAGE IN DISCOVERY EXCEPT AS PROVIDED IN AAA RULES, AND THE RIGHT TO CERTAIN REMEDIES AND FORMS OF RELIEF. OTHER RIGHTS THAT YOU OR THE TJX BUSINESSES WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

*Id.*

In the same location on the "checkout flow" interface where the hyperlink to the TOU appear, the website presents a separate hyperlink to its Privacy Policy, which the TOU purport to "incorporate[] . . . by reference[.]" *Id.* The Privacy Policy addresses

1. the information TJX "may collect . . . from [a consumer] in connection with [his or her] activities at T.J. Maxx, such as when [the consumer] shop[s] on [its] websites or in [its] stores;

2. how TJX uses the information it collects from consumers including, inter alia, to (a) "[p]rocess, manage, complete and account for transactions, including purchases and refund, exchange and layaway requests," (b) "[p]rovide [its] products and services to [consumers] and fulfill [their] orders," (c) "[v]erify [a consumer's] identity in certain instances (such as when [the consumer] pay[s] by check, return[s] merchandise, or request[s] a refund)," and (d) "[s]ecure [its] operations and protect against, identify and help prevent fraud, unauthorized activity, claims and other liabilities and minimize credit risk"; and

3. how and with whom TJX may share consumer information including "with partners or third parties who perform services for [TJX] or with [TJX] contract[s] for the purposes described in th[e] Privacy Notice."

*Id.*

In opposition to the motion, Lloyd argues that when she made her purchases TJX failed to provide adequate notice that she would be contractually bound to the TOU by making those purchases and, therefore, she could not have assented to the TOU. *Opp.* at *1. Further, Lloyd contends that when she made her purchases, she was not informed that the TOU to which she was purportedly agreeing included a mandatory arbitration provision and her waiver of her right to a jury trial in the event of a dispute, and thus she never entered into an agreement to arbitrate. *Id.* Finally, Lloyd submits that the Kobelski declaration and the exhibits thereto are inaccurate and contain inconsistencies rendering them unreliable and inadmissible. *Id.*

## II.    Legal Standard

The Federal Arbitration Agreement ("FAA") "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate*." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)); *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 179 (3d Cir. 1999). Section 2 of the FAA provides that "[a] written provision in . .

. a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The "saving clause" in Section 2 indicates that the purpose of Congress "was to make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967). Under Section 3 of the FAA, a party may apply to a federal court for a stay of the trial of an action "upon any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. Section 4 of the FAA directs courts to compel parties to arbitration so long as "the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. As such, under these provisions a federal court may compel arbitration if one party has failed to comply with an agreement to arbitrate and stay proceedings in any matter subject to arbitration. *Romanov v. Microsoft Corp.*, No. CV 21-03564, 2021 WL 3486938, at *3 (D.N.J. Aug. 9, 2021).

On a motion to compel arbitration, the Court must determine: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the dispute at issue falls within the scope of the arbitration agreement. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 522-23 (3d Cir. 2009). If the response is affirmative on both counts, the FAA requires the court to enforce the arbitration agreement in accordance with its terms. *LoMonico v. Foulke Mgmt. Corp.*, No. CV1811511, 2020 WL 831134, at *3 (D.N.J. Feb. 20, 2020); *see also* 9 U.S.C. § 4. "It is well established that the [FAA] reflects a 'strong federal policy in favor of the resolution of disputes through arbitration.'" *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (quoting *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003)). "But this presumption in favor of arbitration 'does not apply to the determination of

6

whether there is a valid agreement to arbitrate between the parties.'" *Id.* (quoting *Fleetwood Enters. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)); *see also Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 n.3 (3d Cir. 2014) (the presumption in favor of arbitrability "applies only when interpreting the scope of an arbitration agreement, and not when deciding whether a valid agreement exists."); *Jaludi v. Citigroup*, 933 F.3d 246, 255 (3d Cir. 2019) ("The presumption of arbitrability enters at the second step—it applies to disputes about the scope of an existing arbitration clause.").

To determine whether the parties have agreed to arbitrate, courts apply "ordinary state-law principles that govern the formation of contracts." *Century Indem. Co.*, 584 F.3d at 524; *see also Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 289 (3d Cir. 2017). When "applying the relevant state contract law, a court may also hold that an agreement to arbitrate is unenforceable based on a generally applicable contractual defense, such as unconscionability." *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 276 (3d Cir. 2004) (internal citations and quotations omitted).

The Third Circuit has established a two-tiered framework for assessing motions to compel arbitration. *See Guidotti v. Legal Helpers Debt Resolution*, L.L.C., 716 F.3d 764, 776 (3d Cir. 2013). Where it is apparent on the face of the complaint, or in documents relied upon in the complaint, that the claims at issue in the case are subject to arbitration, the case is considered pursuant to the motion to dismiss standard as applied under Fed. R. Civ. P. 12(b)(6). *Id.* at 774–76. However, where the complaint does not establish on its face that the parties have agreed to arbitrate, or where the party opposing arbitration has come forward with reliable evidence that it did not intend to be bound by an arbitration agreement, then the parties are entitled to limited

discovery on the question of arbitrability before a renewed motion to compel arbitration is decided on a summary judgment standard as under Fed. R. Civ. P. 56. *Id.*

In sum, "the legal standard is simply that [courts] apply the relevant state contract law to questions of arbitrability, which may be decided as a matter of law only if there is no genuine issue of material fact when viewing the facts in the light most favorable to the nonmoving party." *Aliments Krispy Kernels, Inc.*, 851 F.3d at 288–89 (3d Cir. 2017).

## III.   Discussion

### a. Choice of Law

The FAA "reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Accordingly, "courts should generally look to the relevant state contract law to determine whether a valid agreement to arbitrate exists." *Aliments Krispy Kernels, Inc.*, 851 F.3d at 288.

"In a diversity case filed in New Jersey, New Jersey choice of law rules govern." *See Lebegern v. Forman*, 471 F.3d 424, 428 (3d Cir. 2006); see also Aliments Krispy Kernels, Inc., 851 F.3d at 289. New Jersey uses the most-significant-relationship test, which consists of two prongs. *Maniscalco v. Brother Int'l Corp.* (USA), 793 F. Supp. 2d 696, 704 (D.N.J. 2011), aff'd sub nom. *Maniscalco v. Brother Int'l* (USA) Corp., 709 F.3d 202 (3d Cir. 2013). First, the court must determine whether a conflict actually exists between the potentially applicable laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143, 962 A.2d 453 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). "If no conflict exists, the law of the forum state applies." *Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011) (citing *P.V.*, 197 N.J. at 143, 962 A.2d 453). If the difference between the substantive laws presents a nonexistent or "false conflict," wherein

8

"the laws of the . . . jurisdictions would produce the same result on the particular issue presented," the forum state's law will govern. *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997). When a conflict exists, the court moves to the second prong, which requires determining "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws. *P.V.*, 197 N.J. at 143, 962 A.2d 453.

Here, the parties concede that the states with relationships to this action apply the same legal standard regarding formation. *See Reply* at *3 n.2 ("Massachusetts, Delaware, and New Jersey apply the same standard for determining if an online agreement exists."); *Opp.* at *14 ("New Jersey, Massachusetts, and Delaware all apply the same standards[.]"). Lloyd and TJX both agree that under New Jersey, Massachusetts, and Delaware law, online agreements are enforceable if there exists: (1) reasonable notice of the terms; and (2) manifestation of assent to those terms. *See*, *e.g.*, *Mucciariello v. Viator, Inc.*, No. 18-cv-14444, 2019 WL 4727896, at *7 (D.N.J. Sept. 27, 2019) (finding online agreement binding under New Jersey law where there was reasonable notice and manifestation of assent); *Holdbrook Pediatric Dental, LLC v. Pro Computer Serv., LLC*, No. 14-cv-6115, 2015 WL 4476017, at *4 (D.N.J. July 21, 2015) (finding that for party to be bound by online agreement under New Jersey law it "must have had reasonable notice of and manifested assent to the . . . terms"); *Tantillo v. CitiFinancial Retail Servs., Inc.*, No. 12-cv-511, 2013 WL 622147, at *7 (D.N.J. Feb. 19, 2013) ("Delaware law concerning the formation and validity of arbitration agreements accords with New Jersey law"); *Kauders v. Uber Techs., Inc.*, 486 Mass. 557, 572, 159 N.E.3d 1033, 1049 (2021) (finding online agreement enforceable under Massachusetts law if there was "reasonable notice of the terms" and "reasonable manifestation of assent to those terms . . . "); *Newell Rubbermaid Inc. v. Storm*,

No. CV 9398-VCN, 2014 WL 1266827, at *6 (Del. Ch. Mar. 27, 2014) (online "contract formation" under Delaware law requires "reasonable notice, either actual or constructive, of the terms of the putative agreement and . . . manifest[ation of] assent to those terms").

Because the law of the states having interests in this matter accord, the Court will resolve the motion without making a choice of law determination and will apply the law of New Jersey, the forum state. *See Tantillo*, No. CIV.A. 12-511, 2013 WL 622147, at *7 (D.N.J. Feb. 19, 2013).

### b. Formation of Web-Based Agreements

As discussed, for a contract to be binding under New Jersey law each party must have "reasonable notice" of and "mutually agreed" upon the contract term. *Hoffman v. Supplements Togo Mgmt., LLC*, 419 N.J. Super. 596, 606-08 18 A.3d 210, 216 (App. Div. 2011); *see also Bacon v. Avis Budget Grp.*, Inc., 959 F.3d 590, 602 (3d Cir. 2020).

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). "Courts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract," and "[t]here is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement*." Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016).

Web-based agreements are often distinguished as "clickwrap" or "browsewrap" agreements. *Mucciariello*, 2019 WL 4727896, at *3. Clickwrap agreements require a user to "consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction." *Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 236 (E.D.Pa. 2007). Browsewrap agreements are typically presented in a hyperlink on the bottom of the homepage of

a website and purport to bind users to the terms by virtue of simply visiting or "browsing" the site. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014); *see also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) ("in a pure-form browsewrap agreement, the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service." (internal citation and quotations omitted).

Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking "I agree." *See Fteja*, 841 F.Supp.2d at 837 (collecting cases). Unlike clickwrap agreements, "where users must click on an acceptance after being presented with terms and conditions . . . browsewrap agreements do not require users to expressly manifest assent." *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 331 (W.D. Pa. 2020). Thus, browsewrap agreements are not automatically deemed valid where it is not shown that the user had *actual* notice of the agreement. *Nguyen*, 763 F.3d at 1176–77 (9th Cir. 2014) (emphasis added). As the Third Circuit has explained, "[t]here is an evolving body of caselaw regarding whether the terms and conditions in browsewrap agreements are enforceable, often turning on whether the terms or a hyperlink to the terms are reasonably conspicuous on the webpage." *James v. Glob. TelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017); *see also Hoffman*, 419 N.J. Super. at 608, 611, 18 A.3d 210 (assessing the enforceability of a forum selection clause in an internet website on the basis of "fundamental standards of reasonable notice," which involves examining "the style or mode of presentation, or the placement of the provision"). In other words, when evaluating whether a plaintiff assented to the terms of a web-based contract, courts look to the "design and content of the relevant interface" to determine if the contract terms were presented to the offeree in a way that would put it on inquiry

11

notice of such terms. *Aminoff & Co. LLC v. Parcel Pro, Inc.*, No. 21CV10377, 2022 WL 987665, at \*3 (S.D.N.Y. Apr. 1, 2022). "When terms are linked in obscure sections of a webpage that users are unlikely to see, courts have refused to find constructive notice." *James*, 852 F.3d at 267. However, "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements." *Id.* quoting *Nguyen*, 763 F.3d at 1177 (internal quotations omitted).

Here, Lloyd contends that the TOU represent a browsewrap agreement. *Opp.* at \*19. TJX maintains that the agreement was neither a clickwrap nor a browsewrap agreement but rather something of a hybrid of the two. *Mot.* at \*16-17. A purchaser using the TJ Maxx website's checkout process was not required to click an "I agree" dialogue box upon being presented with the hyperlink to the Terms of Use. Nor was a purchaser simply left to "browse" the page or told he or she has assented to the TOU by simply passively viewing one screen. Instead, a notice was presented on the final page of the checkout flow process indicating that by taking the action of clicking "Submit Order" the purchaser was assenting to the hyperlinked Terms of Use. Thus, for purposes of this motion, the Court finds that the agreement represented a hybrid between the clickwrap and browsewrap varieties.[2] In making this finding, the Court does not opine on the

---

[2] The Court disagrees with Lloyd that *Wollen* compels the conclusion that the TOU represent a pure browsewrap agreement. A characteristic feature of browsewrap agreements is placement in a submerged and hidden area. In its decision in *Wollen*, the New Jersey Superior Court, Appellate Division, found instructive the Second Circuit's decision in *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002). *See Wollen v. Gulf Stream Restoration & Cleaning, LLC*, 468 N.J. Super. 483, 499, 259 A.3d 867, 876–77 (App. Div. 2021) ("we continue to find instructive the Second Circuit's nearly twenty-year-old decision in Specht[.]"). Paramount to the holding in *Specht* was the Second Circuit's view that the presentation of the hyperlink on a "submerged screen" rendered notice to the terms contained within insufficient. *Specht*, 306 F.3d at 32; *Wollen*, 468 N.J. Super. at 499, 259 A.3d at 877 ("the court concluded that where the arbitration clause was not visible before the users clicked the icon to download the program but was "submerged" elsewhere on the website, the users could not be said to have given consent."). Unlike in *Wollen* where the hyperlink to the subject terms appeared *below* the

sufficiency of hybrid or modified or hybrid browsewap/clickwrap agreements generally.

Regardless of the precise label given, though, the pertinent inquiry is whether the user was

provided with reasonable notice of the applicable terms, based on the design and layout of the

website. *See Hoffman*, 419 N.J. Super. at 611, 18 A.3d 210.

### c.      Existence of a Valid Agreement to Arbitrate

Lloyd contests the existence of a valid agreement to arbitrate, arguing that TJX did not

provide adequate notice of its terms and conditions when Lloyd made her purchases and that she

did not assent to the arbitration provision.

### i.      Applicable Legal Standard and Factual Disputes

"To determine whether there is a valid agreement to arbitrate . . . [courts] must initially

decide whether the determination is made under Fed. R. Civ. P. 12(b)(6) or 56" and thus, what

materials may be considered. *Sanford v. Bracewell & Guiliani, LLP*, 618 F. App'x 114, 117 (3d

Cir. 2015).

The Third Circuit has held that a motion to compel arbitration will be reviewed under the

Rule 12(b)(6) standard "when it is apparent, 'based on the face of a complaint, and documents

relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable

arbitration clause . . . '" *Guidotti v. Legal Helpers Debt Resolution*, L.L.C., 716 F.3d 764, 776

(3d Cir. 2013) (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832

---

"View Matching Pros" submission button, in this case the evidence shows the TOU are directly above the "PLACE ORDER" icon. In other words, the placement of the hyperlink in this case was more closely approximated to ensure assent as it was not hidden below or "submerged." For this reason, the *Wollen* court's characterization of the terms and conditions in that case as a "browsewrap-type" agreement are not dispositive of the question here. In light of this relevant factual distinction, and considering the body of caselaw (discussed *infra*) treating web-based agreements similar to the one in this case as a modified or hybrid rather than a true browsewrap agreement, the Court finds Lloyd's comparison to *Wollen* less helpful.

F.Supp.2d 474, 481 (E.D.Pa. 2011); *see also MZM Construction Co., Inc. v. N.J. Building Laborers Statewide Benefits Fund*, Nos. 18-3791 & 19-3102, 2020 WL 5509703, at *14 (3d Cir. Sept. 14, 2020). Conversely, the Rule 56 standard will apply "when either the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to establish on its face that the parties agreed to arbitrate," or when "the opposing party has come forth with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement[.]" *Guidotti*, 716 F.3d at 774 (internal citations and quotations omitted). Stated differently, *Guidotti* provides two pathways to reach summary judgment on the issue of arbitrability: either the parties' agreement to arbitrate the dispute is not clear on the face of the complaint (or incorporated documents), or the non-movant comes forward with additional facts that put an otherwise facially-apparent agreement to arbitrate at issue. *Horton v. FedChoice Fed. Credit Union*, 688 F. App'x 153, 156 (3d Cir. 2017).

While "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" in deciding a motion to dismiss, *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), "an exception to the general rule is that a document integral to or explicitly relied upon in the complaint' may be considered without converting the motion into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citation and quotations omitted); *see also In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426.* "[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426. Further, "[w]hen the merit, or lack thereof, in the affirmative defense of arbitrability can be discerned from the face of a complaint or documents

that the complaint relies on, a motion to compel arbitration can be resolved under the same kind

of standard applicable to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)."

*Noble v. Samsung Elecs. Am., Inc.*, 682 F. App'x 113, 115 (3d Cir. 2017).

      TJX advocates for the application of Rule 56. On the other hand, Lloyd does not state a

position as to which standard—Rule 12(b)(6) or Rule 56—is proper here. The Court finds this

motion is appropriately governed under the Rule 12(b)(6) standard.

      Here, the arbitration agreement (and the TOU in which it appears) is not attached to,

affirmatively incorporated into, or specifically mentioned in the Complaint.[3] Nevertheless, the

practices of TJX concerning the return of the purchased merchandise and its use of customer

information are foundational to Lloyd's allegations. The TOU containing the agreement to

arbitrate at issue incorporates by reference a Privacy Policy specifically addressing the collection

and use of personal customer information – the conduct at the crux of this matter. Among other

claims, Lloyd alleges in the Complaint that TJX acted unlawfully in violation of the NJCFA

when it "intended to mislead consumers and induce them to rely on their misrepresentations and

omissions, and Plaintiffs and Class Members did rely on their misrepresentations and omissions

relating to their use, sharing, and security of their data, and the return and/or exchange process."

*Compl.* ¶ 103. Lloyd's theory of liability therefore necessarily implicates these provisions

---

[3] Where a plaintiff's complaint "makes no mention of the [arbitration agreement], that fact does not foreclose operation of a Rule 12(b)(6) standard." *Benedict v. Guess, Inc.*, No. 5:20-CV-4545, 2021 WL 37619, at *4 (E.D. Pa. Jan. 5, 2021) (quoting *Sorathia v. Fidato Partners, LLC*, No. CV 19-4253, 2020 WL 5121473, at *3 (E.D. Pa. Aug. 31, 2020) (internal quotations omitted). "Precluding review of a complaint under the Rule 12(b)(6) standard simply because a plaintiff has avoided reference to an existing arbitration agreement would frustrate the purpose of the FAA: to facilitate expedited resolution of disputes where the parties to a contract have opted for arbitration." *Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) (observing "the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts.")).

incorporated in the TOU, and the TOU contains the subject arbitration agreement. These circumstances weigh decidedly in favor of applying the standard under Rule 12(b)(6). Moreover, Lloyd has not produced any affidavits denying having received, viewed, understood or assented to the TOU containing the arbitration agreement. *See, e.g., Sorathia v. Fidato Partners*, 2020 WL 5121473, at *3 (E.D. Pa. Aug. 31, 2020) (applying the Rule 12(b)(6) standard where defendants attached agreement containing arbitration clause to the motion to compel arbitration, plaintiff did not dispute receiving it, and "the crux of the dispute between the parties center[ed] on the scope and enforceability of that arbitration agreement."). Under the circumstances where these matters have not been contested with evidence, Lloyd has not placed the issue of arbitrability sufficiently at issue to trigger the Rule 56 standard by simply challenging the *validity* of the agreement to arbitrate. Indeed, "that interpretation would render the Rule 12(b)(6) standard a nullity; if a party has filed a motion to compel arbitration, then the other party necessarily questioned arbitrability." *Silfee v. Automatic Data Processing, Inc.*, 696 F. App'x 576, 578 (3d Cir. 2017); *see also Benedict v. Guess, Inc.*, No. 5:20-CV-4545, 2021 WL 37619, at *4 (E.D. Pa. Jan. 5, 2021) ("The purposes of the Act would be frustrated if plaintiffs could avoid having their claims quickly compelled to arbitration simply by failing to mention the existence of clearly applicable arbitration agreements in their complaints.") (internal citation and quotations omitted).

Turning then to the second *Guidotti* scenario, the Court considers whether Lloyd has come forward with enough evidence to put the question of arbitrability at issue in light of the record. *See Horton v. FedChoice Fed. Credit Union*, 688 F. App'x 153, 156 (3d Cir. 2017). In opposition to the motion, Lloyd challenges the admissibility and sufficiency of the screenshots

depicting the "checkout flow" process and the TOU as well related statements introduced in the Kobeski declaration made by TJX's Vice President of Digital Experience and Site Operations.

As an initial matter, the Court recognizes that the appearance and presentation of the "checkout flow" process and the TOU bear on the question of whether Lloyd had notice of and properly assented to the terms of use. *See Hite v. Lush Internet Inc.*, 244 F.Supp.3d 444, 451 (D.N.J. 2017) (examining whether a website gave reasonable notice of the terms of use and recognizing that New Jersey courts apply a reasonable notice standard to the manner in which contract terms are displayed in determining whether they are enforceable, including looking to the style or mode of presentation, and the placement of the provision*); see also Stacy v. Tata Consultancy Servs., Ltd.*, No. CV1813243, 2019 WL 1233081, at *6 (D.N.J. Mar. 14, 2019). If Lloyd was not given reasonable notice of the TOU, then she could not have assented to them and thus would not be bound by any arbitration provision found therein. It follows that if the evidence presented by TJX concerning the checkout flow process or the TOU is inadmissible or otherwise insufficient, the Court may lack a proper basis to find there was a valid agreement to arbitrate. Each of the asserted factual disputes are addressed, in turn.

First, Lloyd challenges the admissibility and sufficiency of the screenshots depicting the "checkout flow" process. Because the screenshots of the "checkout flow" process were printed on January 10, 2022, Lloyd challenges whether they accurately reflect the process as it would have appeared on the purchase dates of April 6, 2019, May 21, 2019, July 31, 2020, May 20, 2021, and October 21, 2021. Lloyd also disputes the veracity of Kobelski's statements purporting to describe how the hyperlink to the terms of use appeared at the time of purchase. Lloyd contends that these statements are unreliable considering the absence of further documentary

evidence and where Kobelski failed to explain the basis for her supposed knowledge of how the hyperlink was presented.

Contrary to Lloyd's argument, the Court may properly consider the proffered declaration and exhibits in determining whether there existed reasonable notice and assent to the arbitration agreement in the TOU. Courts confronted with this same issue have regularly relied on the same type of evidence provided by TJX and consider statements by those with personal knowledge about what "would have appeared" on a user's screen. *See, e.g., Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 70-72 (2d Cir. 2017) (relying on screenshots and a declaration that represented that Uber maintained records from which the company could see what a user had seen and done); *Cordas v. Uber Technologies, Inc.*, 228 F. Supp. 3d 985, 988-989 (N.D. Cal. 2017) (relying on testimony about what a prospective user would have seen and had to do to create an account); *Fteja,* 841 F. Supp. 2d at 834-35 (allowing declarations with testimony and screenshots of what a user did and would have seen);  *Maynez v. Walmart, Inc.*, No. CV200023, 2020 WL 4882414 (C.D. Cal. Aug. 14, 2020) ("The Court is satisfied that the checkout process for the Walmart app described in the Deverkonda Declaration accurately reflects the process that Plaintiff encountered in April of 2019."); *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17CV04570, 2017 WL 7309893, at *7 (S.D.N.Y. Nov. 20, 2017), report and recommendation adopted as modified, No. 17-CV-4570, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018) (B&N has offered the sworn testimony of the person responsible for overseeing the implementation of a change to its website that required certain notice language to be added directly beneath the "Submit Order" button. Bernardino offered no evidence whatsoever to suggest that the website on February 3, 2017 did not look the way declarant stated.). Further, Lloyd has not produced any affidavits denying that the "checkout flow" process appeared as depicted in the dated screenshots

introduced by the Kobelski declaration. Because courts regularly rely on the type of evidence presented in the Kobelski declaration, and in the absence of any affidavit or other evidence contradicting that the screenshots reflect the "checkout flow" process as it would have appeared on the dates of purchase, Lloyd's challenge in this regard is speculation insufficient to create a genuine dispute regarding the existence or authenticity of the subject agreement to arbitrate.

Second, Lloyd attempts to add another dimension to the parties' factual dispute over whether she agreed to arbitrate by challenging the authenticity of the TOU screenshots introduced in the Kobelski declaration. Specifically, Lloyd presents screenshots from the Wayback Machine purporting to represent an alternative version of the terms of use that would have appeared on the May 9, 2019 date of attempted return or exchange and on other various dates. Lloyd argues that:

> Although Ms. Kobelski states that Exhibit C is an accurate reflection of the Terms as they appeared on between January 17, 2019 and April 24, 2019, its appearance differs significantly from the versions that appear on the Wayback Machine for the dates most closely preceding and following the period for which Exhibit C (of unknown provenance) is offered. Exhibits A and B to the Kelston Declaration, versions of the terms obtained from the Wayback Machine for October 4, 2018, and May 9, 2019, are consistent: the background is white, the headers are lowercase, the spacing is consistent, and bullet points are used in various sections. Kobelski Exhibit C, on the other hand, which supposedly appeared between January 17, 2019 and April 24, 2019, has a grey background, the headers are uppercase, the spacing is different, and there are no bullet points in any sections.

*Opp.* at *10. Lloyd contends that "these differences are not insignificant" because "the appearance and readability of the Terms impact the adequacy of the notice provided to Plaintiff of the content of the Terms, including the arbitration provision." *Id.*

The Court finds these matters insufficient to create a genuine dispute regarding the existence or authenticity of the subject agreement to arbitrate. First, as with the screenshots of the checkout flow process, the TOU screenshots are based on the personal knowledge of

Kobelski. *See,* e.g. *Snow v. Eventbrite, Inc.*, No. 3:20-CV-03698, 2021 WL 3931995, at *6 (N.D. Cal. Sept. 2, 2021) ("a sworn declaration authenticating the agreements is sufficient to meet [defendant's] burden. It is the type of evidence courts usually examine in these cases."). Second, it is unclear whether screenshots from the Wayback Machine are admissible in the Third Circuit absent authentication by an Internet Archive employee. *See United States v. Bansal*, 663 F.3d 634, 667 (3d Cir. 2011) ("This Court generally agrees that, to satisfy the requirements of Rule 901, screenshots from the Wayback Machine must be authenticated by an Internet Archive employee or another individual with experience in its operation and reliability."). Third, and most significantly, the Lloyd has not shown that the differences contained in the Wayback Machine version would render notice inadequate. Upon conducting a side-by-side review, the Court is unable to discern anything about the *de minimus* variations in the versions of the TOU presented that would create a dispute of fact material to the issue of reasonable notice of the agreement to arbitrate his claims and their intent to delegate arbitrability. *See Snow*, 2021 WL 3931995, at *6 ("The plaintiffs also contend that there is no way to know precisely what the [terms of service] looked like without [metadata] . . . but they offer no reason that a slight change in the look of the TOS itself . . . would alter the analysis."). Both are titled "arbitration agreement & waiver of certain rights", both appear on page six of each ten pages exhibit, and both contain the same language. Because the arbitration clauses bear no material differences in terms of their visibility and conspicuousness and are otherwise substantively the same, the Court is not persuaded that the Wayback Machine screenshots would sway the issue of formation even if they were presented in admissible form. For these reasons, the Wayback Machine screenshots neither render TJX's evidence inadmissible, nor do they create a material dispute of fact.

Upon review of the foregoing arguments and assertions of fact – which are presented in a vacuum without any sworn statement by Lloyd herself that she did not assent to the TOU – the Court concludes that Lloyd has not "come forth with reliable evidence that is more than a 'naked assertion . . . that [she] did not intend to be bound' by the arbitration agreement[.]" *Guidotti*, 716 F.3d at 774 (quoting *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 55 (3d Cir.1980)). Lloyd, therefore, has not triggered the application of the discovery and summary judgment review framework set forth in *Guidotti*. Because the facts and evidence permit the Court to determine whether or not Lloyd is entitled to arbitration at this juncture as a matter of law, the correct standard of review for this motion is under Rule 12(b)(6). In making that determination, the Court is permitted to "consider the substance of the contract[] that ostensibly compel[s] arbitration." *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 168 n.2 (3d Cir. 2014) (citation omitted); *see also Noble*, 682 F. App'x at 115 (3d Cir. 2017).

### ii.   Reasonable Notice and Assent

The Court is satisfied that the design and content of the "checkout flow" process website and the agreement's webpage demonstrate that TJX presented the TOU in a manner sufficient to give Lloyd reasonable notice.[4] Specifically, the presentation of the TOU hyperlink in clear font in a relatively uncluttered location of the screen and its proximity to the "PLACE ORDER" button, coupled with the textual notification, is enough to place a reasonably prudent user on notice.

---

[4] The relevant inquiry for assessing reasonable notice is whether "the specifics surrounding [the] agreement revealed either that the user knew or should have known about the existence of the terms and conditions[.]" *Liberty Syndicates at Lloyd's v. Walnut Advisory Corp.*, No. 09-1343, 2011 WL 5825777, at *4 (D.N.J. Nov. 16, 2011) (applying New Jersey law).

The "terms of use" hyperlink appears in legible, underlined, bolded black font against a white background. Given its placement in a relatively uncluttered location on the final screen of the "checkout flow" interface directly above the "PLACE ORDER" icon that Lloyd was required to click to make her purchase, the hyperlink was spatially and temporally proximate – not hidden in an area that she was unlikely to see or that required scrolling to view. Although it was possible for Lloyd to make the purchases without *clicking* the hyperlink, the likelihood of Lloyd completing them without *observing* the hyperlink is improbable.

The Court recognizes, however, that proximity or conspicuousness alone may not be enough to give rise to reasonable notice. In several cases where browsewrap agreements have been deemed invalid, the websites in question often failed to include a statement informing the user that, by clicking on a button, he or she was agreeing to be bound by hyperlinked terms. *Mucciariello*, 2019 WL 4727896, at *6 (string citing *Nguyen*, 763 F.3d 1171 at 1179 (refusing to enforce hyperlinked terms, where the defendant's website did not include text informing the user that, by clicking on a button, he or she was providing consent); *Holdbrook Pediatric Dental, LLC*, No. 14-6115, 2015 WL 4476017, at *6 (D.N.J. July 21, 2015) (holding that hyperlinked terms were invalid, because the hyperlink was placed in "isolation," with "no statement that signing the agreement indicated acceptance of the" terms and conditions.); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) (finding insufficient notice where the hyperlinked terms were inconspicuously located at the bottom of a webpage, which did not include a statement advising assent)). Distinguishing cases in which hyperlinked terms were unaccompanied by a notification, the court in *Mucciariello* enforced a forum selection clause contained within hyperlinked terms upon finding that the website satisfied reasonable notice. *Mucciariello*, 2019 WL 4727896, at *6-7, 10 n.3 ("Significantly, unlike those cases,

Viator's checkout page included a statement of notice, within close proximity to the 'Book Now' icon").

Here, in addition to the hyperlink appearing directly above the "PLACE ORDER" button that Lloyd was required to click to complete the purchase, the page also contained a textual notification in the same area indicating that "By placing your order, you agree to the TJ MAXX terms of use . . ." *Kobelski Decl.* ¶ 3, Exhibit B. Where a website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, as in *Mucciariello*, courts have been more amenable to enforcing browsewrap agreements.[5]

Thus, the TJ Maxx website included precisely the type of textual notice capable of transforming an otherwise unenforceable arbitration agreement into an enforceable one.

_____

[5] *See, e.g.*, *Mucciariello*, 2019 WL 4727896, at *6 ("hyperlinked terms, such as the one in this case, amount to an enforceable agreement when 'reasonable notice' is provided and a button is designated to manifest assent, near a statement informing the user that, by clicking, he or she is agreeing to be bound by the hyperlinked terms"); *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04–04825, 2005 WL 756610, at *2, *4–5 (N.D.Cal. Apr. 1, 2005) (enforcing forum selection clause in website's terms of use where every page on the website had a textual notice that read: "By continuing past this page and/or using this site, you agree to abide by the Terms of Use for this site, which prohibit commercial use of any information on this site"); *Fteja*, 841 F. Supp. 2d at 835 (reasonable notice where users of a social networking website clicked a "Sign Up" button immediately above a sentence that read "[b]y clicking Sign Up, you are indicating that you have read and agree to the [hyperlinked] Terms of Service."); *Snap-On Bus. Solutions Inc. v. O'Neil & Assocs.*, 708 F. Supp. 2d 669, 682-83 (N.D. Ohio 2010) (finding sufficient notice, where the user "clicked on an 'Enter button' to proceed," underneath which the webpage stated: "[t]he use of . . . this site is subject to the terms and conditions," which were viewable in "a green box with an arrow that users must click . . ."); *5381 Partners LLC v. Shareasale.com, Inc.*, No. 12-4263, 2013 WL 5328324, at *7 (E.D.N.Y. 2013) (enforcing online agreement where defendant's reference to the hyperlinked terms were near an "activation button," and an accompanying statement which read, "[b]y clicking and making a request to Activate, you agree to the [hyperlinked] terms and conditions."); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 908, 912 (N.D. Cal. 2011) (enforcing online agreement where users clicked on an "allow" button, directly underneath which was a statement in "smaller grey font," indicating that clicking on the button constituted acceptance of the blue hyperlinked "terms of service"); *Bernardino*, 2017 WL 7309893, at *5 (upholding an online agreement where the user had to "click on a 'Submit Order' button with the language '[b]y making this purchase you are agreeing to out Terms of Use and Privacy Policy' immediately below it in order to complete her purchase.").

Specifically, the evidence pertaining to the "checkout flow" process introduced by TJX reflects that the TJ Maxx website set forth a conspicuous notification directly above the "PLACE ORDER" providing that "By placing your order, you agree to the T.J. Maxx terms of use[.]"

As a further matter, the location of the notice and hyperlink in TJ Maxx's "checkout flow" process above the "PLACE ORDER" icon differentiates this case from *Wollen* where that notice and hyperlink appeared below the "View Matching Pros" submission button. *See* n. 3, *supra*. The facts attendant to the instant motion are distinguishable from those of *Specht* for similar reasons. In *Specht*, the Second Circuit refused to enforce an arbitration provision in a website's licensing terms where the hyperlink to the terms was located at the bottom of the page, hidden below the "Download" button that users had to click to initiate the software download. *See Specht*, 306 F.3d at 30. The Second Circuit held that that "a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms." *Id.* at 32. By contrast, here the hyperlink to the TOU appears directly above the "PLACE ORDER" button that a user must click on to complete his or her order and is viewable without the need to scroll. Moreover, unlike the plaintiff in *Specht*, Lloyd was not required to visit another webpage in order to understand that a binding contract was created upon confirming her purchase of the merchandise.

In addition to the existence of reasonable notice, there is evidence that Lloyd had actual notice of the agreement to arbitrate. To the extent Lloyd completed the "checkout flow" process several times after TJX moved to compel her claims to arbitration in the Central District of California arising out of similar facts (*see* action entitled *Shadi Hayden, et al. v. The Retail Equation, Inc., et al.*, Case No. 8:20-cv-01203-DOC-DFM), and insofar as Lloyd's claims and/or

alleged damages here arise from purchases and/or attempted returns post-dating that motion, Lloyd may have been on actual notice of the agreement to arbitrate.[6]

The Court must also disagree with Lloyd that there was no manifestation of assent because the arbitration clause was "buried in the Terms[.]" *See Opp.* at *21. Agreements similar to the one here – where the relevant terms and provisions are hyperlinked and the user is notified that he or she must perform an action to provide assent, such as, for example, clicking on a button – have been found enforceable under New Jersey law. *Beture v. Samsung Elecs. Am., Inc.*, No. 17-5757, 2018 WL 4259845, at *5-6 (D.N.J. July 18, 2018) ("[M]odified browsewrap agreements are valid and enforceable under New Jersey law."); *Holdbrook Pediatric Dental, LLC*, 2015 WL 4476017, at *2-3 (D.N.J. July 21, 2015); *Mucciariello*, 2019 WL 4727896, at *6 (D.N.J. Sept. 27, 2019). This understanding comports with New Jersey law governing contract formation, which establishes that the element of assent exists when the parties "been fairly informed of the contract's terms before entering into the agreement." *Hoffman*, 419 N.J. Super. at 606, 18 A.3d at 210; *see also Mucciariello*, 2019 WL 4727896, at *3. Equally well-established under New Jersey law is the precept that "[n]o particular form of words is necessary to accomplish a clear and unambiguous waiver of rights," and the arbitration clause "will pass muster when phrased in plain language that is understandable to the reasonable consumer."

---

[6] Courts frequently enforce web-based agreements where the user had actual notice of the agreement. *See, e.g., Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401-04 (2d Cir. 2004) (finding likelihood of success on the merits in a breach of browsewrap claim where the defendant "admitted that . . . it was fully aware of the terms" of the offer); *Sw. Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-0891, 2007 WL 4823761, at *4-6 (N.D. Tex. Sept. 12, 2007) (finding proper contract formation where defendant continued its breach after being notified of the terms in a cease and desist letter); *Ticketmaster Corp. v. Tickets.Com, Inc.*, No. CV–997654, 2003 WL 21406289, at *2C (C.D.Cal. Mar. 7, 2003) (denying defendants' summary judgment motion on browsewrap contract claim where defendants continued breaching contract after receiving letter quoting the browsewrap contract terms).

*Atalese v. U.S. Legal Servs. Grp., L.P.*, 219 N.J. 430, 443 (2014). Applying New Jersey contract law, the Third Circuit has held that for a party to have reasonable notice, the writing must "appear to be a contract" and "be called to the attention of the recipient." *Noble*, 682 F. App'x at 116. Stated differently, "contractual terms, including an arbitration clause, will only be binding when they are reasonably conspicuous rather than proffered unfairly, or with a design to de-emphasize its provisions." *Id*. Although Lloyd's expression of assent to arbitration was not separate from her assent to place the order, and therefore not as explicit as in a true clickwrap agreement, the Court is convinced that it was nevertheless unambiguous in light of the conspicuous and objectively reasonable notice of the terms, as discussed in detail above.

The Third Circuit's discussion in *Noble v. Samsung Electronics America* is instructive on the adequacy of notice issue for purposes of determining mutual assent. See *Noble v. Samsung Elec. Am., Inc.*, 862 F. App'x 113 (3d Cir. 2017). *Noble* involved consumer fraud claims brought in the context of a class action by the consumer of a smartwatch containing an alleged defect. *Id.* at 114. A motion to compel arbitration was filed by the defendant supplier of the product based on an arbitration agreement set forth in a booklet inserted in the product packaging. The district court denied the motion on the grounds that the arbitration clause was unreasonably hidden and thus the agreement was not enforceable. *Id.* at 115. The arbitration clause was set forth at page 97 of a 143-page booklet included in the smartwatch packaging, entitled "Health and Safety and Warranty Guide." *Id.* The key issue on appeal to the Third Circuit was whether the consumer plaintiff had assented to the arbitration clause set forth in the in-box booklet. *Id.* at 116-17. The Third Circuit determined he had not. *Id.* Distinguishing the agreement from enforceable agreements, the Third Circuit observed that "Here, the document in which the Clause was included did not appear to be a bilateral contract, and the terms were buried in a manner that

gave no hint to a consumer that an arbitration provision was within . . . More particularly, there was no indication on the outside of the Guide that it was a bilateral contract or included any terms or conditions." *Id.* at 116. The court concluded that, under those circumstances, a consumer would have no reasonable notice he was assenting to a bilateral contract, much less an agreement to arbitrate disputes. *Id.* at 117-18.

Here, it is much clearer that Lloyd knew or should have known the TOU was a bilateral contract where Lloyd was making a transaction for the sale of goods[7] and the hyperlink appearing directly above the "PLACE ORDER" button contained textual notifications indicating that by placing the order, Lloyd agreed to the TOU and Privacy Policy. Further distinguishing the instant motion from *Noble* where the arbitration clause was set forth at page 97 of a 143-page booklet, the evidence of record shows the TOU is *significantly* shorter in length and the provision titled "**Arbitration Agreement & Waiver Of Certain Rights**" much earlier in the document. Accordingly, the Court disagrees with Lloyd that there was no manifestation of assent because the arbitration clause was unreasonably hidden or "buried in the Terms[.]"[8]

### d.    Scope of Arbitration

Having determined that the parties entered into a valid agreement to arbitrate, the remaining issue is whether the dispute falls within the scope of the arbitration agreement. *See*

---

[7] This point similarly differentiates this motion from *Wollen*. *See Wollen*, 468 N.J. Super. 483, 259 A.3d 867.

[8] Additionally, under New Jersey law "'applying the "fundamental precepts" of contract law to determine the enforceability of contracts formed over the internet between companies and their users . . . where a website provides reasonable notice of the hyperlinked agreement, users will be bound to it even if the party did not review the terms and conditions of the hyperlinked agreement before assenting to them." *Hite v. Lush Internet Inc.*, 244 F. Supp. 3d 444, 451 (D.N.J. 2017) (internal citations and quotations omitted); *see also Singh v. Uber Tech., Inc.*, 235 F.Supp.3d 656, 2017 WL 396545, at *4 (D.N.J. Jan. 30, 2017).

*Century Indem. Co.*, 584 F.3d at 522-23 (on a motion to compel arbitration, the Court must determine: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the dispute at issue falls within the scope of the arbitration agreement.). Because it is not disputed that the language of the arbitration clause delegates questions encompassed by this action to the arbitrator,[9] and given the strong federal policy favoring arbitration for matters concerning the scope of arbitrability,[10] the Court concludes that this action should be referred to arbitration with a stay implemented for the pendency of that proceeding or until further order.

## IV.    Conclusion

For the reasons set forth herein TJX's motion will be granted in part and denied in part. The Motion will be granted to the extent it seeks an order compelling arbitration of all claims asserted by Lloyd and staying those claims for the pendency of that proceeding or until further order. The Motion will be denied insofar as it requests an order for dismissal of Count One, Count Three, and Count Five asserted by Lloyd in the Complaint. An appropriate order will follow.

December 29, 2022                              /s/ Joseph H. Rodriguez
                                              Hon. Joseph H. Rodriguez, USDJ

---

[9] *See AT&T Tech., Inc. v. Commc'n Workers*, 475 U.S. 643, 650 (1986) ("arbitration should only be denied where it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (internal quotations omitted").

[10] *See Moses H. Cone Memorial Hosp.*, 460 U.S. 1, 24–25 ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").